UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXIMILIAAN UNGER,<br><br>    Plaintiff,<br><br>    v.<br><br>MORRIS + D'ANGELO, et al.,<br><br>    Defendants. | Case No. 23-cv-03284-JSC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 96 |

Plaintiff, a citizen of Australia, brings this action against Defendants, who are accountants and an accounting firm. (Dkt. No. 1.)[1] Plaintiff alleges he transferred funds to Defendants who then failed to return the funds. Defendants Daniel Morris, Morris + D'Angelo, and Steven Geller stipulated to, and the Court entered, a judgment where "Plaintiff Maximiliaan Unger, an individual, shall recover from Defendant Daniel Morris, an[] individual, and Defendant Morris + D'Angelo, a general partnership, jointly and severally" a principal amount of $3,600,000.00 plus interest. (Dkt. No. 84.) Defendant Geller was dismissed from the action. (*Id.* at 2.) Plaintiff now brings this motion for summary judgment against Defendant Patrick D'Angelo, asserting Defendant "D'Angelo is liable to Plaintiff as a general partner of Morris + D'Angelo ("MDA") for Plaintiff[']s claims in this matter, and specifically that D'Angelo is liable for the already entered judgment in this lawsuit against MDA." (Dkt. No. 96 at 2.) Defendant has not filed a response.

After carefully considering the arguments and briefing submitted, the Court concludes oral argument is unnecessary, *see* Civ. L.R. 7-1(b) and GRANTS Plaintiff's motion. The facts in

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document. Because Mr. D'Angelo's deposition transcript has four pages condensed onto each page, citations to the deposition transcript are to the page numbers at the top-right corner of each quadrant.

Plaintiff's motion are undisputed. Drawing all inferences in Defendant D'Angelo's favor, as a matter of law Defendant D'Angelo is liable to Plaintiff as if he were a partner of Morris + D'Angelo because Plaintiff, reasonably relying on Defendant D'Angelo's representations that he was a partner of Morris + D'Angelo, entered into a transaction with the partnership to Plaintiff's detriment.

## BACKGROUND

The following facts are from Plaintiff's evidence in support of his motion, which consists of his declaration, Mr. D'Angelo's deposition, and various exhibits. The Court includes only those facts relevant to this Order. Because Mr. D'Angelo has not filed a response to this motion, the facts are not in dispute.

**A. The Partnership and Mr. D'Angelo's Ownership Interest Over Time**

At his deposition, Mr. D'Angelo testified he and Mr. Morris "went into practice" together in December 1994. (Dkt. No. 96-3 at 15:5-6.) Between 1994 and 2015, Mr. D'Angelo was "the managing partner of the firm" Morris and D'Angelo ("MDA"). (*Id.* at 26:25-27:1.) In the beginning, Mr. Morris and Mr. D'Angelo were "50/50 partners" who co-owned the firm, "but [Mr. D'Angelo] ran the firm, [Mr. Morris] got the clients, and [the two] started growing" the firm. (*Id.* at 17:25-18:1.) To Mr. D'Angelo's knowledge, "the firm [is] still a general partnership in California." (*Id.* at 28:15-18.)

On October 1, 2015, Mr. D'Angelo sold 90 percent of his interest in the partnership. (*Id.* at 38:24-39:1.) Mr. D'Angelo testified "from October 1st, 2015 forward … [he] owned 5 percent [of the firm], Mr. [Steven] Geller owned 20 percent, and then Mr. Morris would have 75 percent." (*Id.* at 40:2-5.) Further, "[i]t was [Mr. Morris]'s idea for me to keep 5 percent so that I didn't completely disappear. And I was going to be working for probably another five years, and that was the plan originally." (*Id.* at 39:1-4.) Mr. D'Angelo testified he "stopped being a partner" on January 1, 2022; at that point, he sold his remaining interest in the firm and "was an employee of the firm," "not a partner." (*Id.* at 38:11-15.) For purposes of this motion, Plaintiff agrees "D'Angelo did in fact sell his interest in MDA no later than January 5, 2022" (Dkt. No. 96 at 4 n. 4) and "the instant motion is filed on the basis that D'Angelo's withdrawal [from the partnership]

2

was effective." (Dkt. No. 96-2 ¶ 2.)

**B. Mr. D'Angelo's Representations to Plaintiff Regarding Partnership**

At various points in 2021 and 2022, Plaintiff, Mr. Morris, and Mr. D'Angelo discussed the possibility of MDA providing services to Plaintiff. (Dkt. No. 96-1 ¶¶ 9-13; *see generally* Dkt. No. 96-3.) Mr. D'Angelo "introduced himself as a partner of MDA" to Plaintiff during a "virtual meeting on May 7, 2021." (Dkt. No. 96-1 ¶ 3.) Plaintiff attests:

> During all of these discussions as well as the discussions that were to follow, Morris and D'Angelo specifically told me that they were both partners of MDA, and hiring MDA meant that they would both take responsibility for and work as a team on the engagement. D'Angelo and Morris both touted their relationship over many years and the multitude of experience that they and their firm had from assisting many different clients over the years. Morris specifically spoke highly of his partnership with D'Angelo, and called it a "marriage." He mentioned that he had even written an article about his "business partner" D'Angelo, which was featured prominently on the Morris + D'Angelo website and which I reviewed at the time. That article, which is entitled "My Business Partner of 3-Decades, Pat D'Angelo" is still accessible online on the Morris + D'Angelo domain today at https://www.cpadudes.com/pat-dangelomorris- dangelo/. [...] They were both licensed accountants and I came to see that one of the main benefits of hiring MDA was I would receive the benefits of both of their expertise. It also appeared to me at this time that D'Angelo was going to be the main point of contact at MDA for getting the engagement done and for actually doing the work that was needed.

(Dkt. No. 96-1 ¶ 8.)

For example, Mr. D'Angelo emailed Plaintiff on April 12, 2022 to set up a meeting. (Dkt. No. 96-1 ¶ 11; Dkt. No. 96-21 at 2.) Mr. D'Angelo's email signature said "Managing Partner" above the firm's name. (Dkt. No. 96-1 ¶ 11; Dkt. No. 96-21 at 2.) At his deposition, Mr. D'Angelo answered in the affirmative to questions about this email, acknowledging "this is an email from [Mr. D'Angelo] to … Plaintiff" with "the same email signature that [Mr. D'Angelo] had used in the past" which "says that [he is] the managing partner at the firm." (*See* Dkt. No. 96-3 at 122:2-25.) Mr. D'Angelo testified, however, the email signature was not "correct" – that is, he was not a partner of the firm "at this time." (*See id.*) Later, on April 26, 2022, MDA's office manager emailed Plaintiff "[p]er your conversations with Pat and Dan, attached please find the Engagement Letter for your review and signature." (Dkt. No. 96-25 at 2; Dkt. No. 96-1 ¶ 13.) The engagement letter had Defendant Morris's signature and listed Defendant D'Angelo as one of

3

1  three "[p]artners."  (Dkt. No. 96-25 at 6; Dkt. No. 96-1 ¶ 13.)  Plaintiff attests "[a]t no time did

2  anyone inform us that [Mr. D'Angelo] was no longer a partner at the firm."  (Dkt. No. 96-1 ¶ 15.)

3  When asked "Did you ever tell [Plaintiff] … that you were no longer a partner at the firm?" Mr.

4  D'Angelo testified "Not to my knowledge."  (Dkt. No. 96-3 at 123:3-5.)

5        Plaintiff attests he relied on representations that Mr. D'Angelo was a partner in entering

6  the transaction for money services, to his own detriment:

> Prior to utilizing MDA for this service, I did further due diligence into the firm, even using an attorney to assist. We confirmed that the money service business had a license that was in good standing, checked for any complaints against MDA, and looked through the profiles of the team members on LinkedIn. We did not find any issues. Moreover, from that search, D'Angelo was indicated to be a partner of MDA every place that I looked, including the MDA website and D'Angelo's own LinkedIn page. The reason that I performed such extensive due diligence is that had there been any hint of trouble, I would not have moved forward with sending any funds to MDA. Had I known that D'Angelo had withdrawn from the partnership, that would have immediately led to me asking more questions, and I would not have gone forward with the transfer.
>
> Ultimately, on July 28, 2022, I transferred stablecoin assets (digital assets where one token is worth one U.S. dollar) in an amount of $2.5 million as instructed by MDA.
>
> I never would have transferred these funds had I not been under the impression that they would be held secure by MDA, and that MDA included D'Angelo as a partner. Without D'Angelo being a partner, and one who I had communicated with and worked with on many occasions and trusted, I never would have trusted MDA. Neither D'Angelo nor anyone else at MDA had ever told me that D'Angelo had withdrawn from the partnership[.]
>
> […]
>
> The various communications regarding my attempts to access my funds are set forth in the Complaint filed in this matter between Paragraphs 40 to 89. I have read these paragraphs and verify and attest to the accuracy of the events as described therein.
>
> In sum, I relied on D'Angelo continuing to be a partner at MDA to my own detriment. D'Angelo and MDA repeatedly made representations to me, including that D'Angelo was a partner. I believed them. I was particularly inclined to believe them as they were licensed accountants and had particular knowledge of corporate structuring since this is a topic on which they often provided advice to clients. From the very beginning, it was represented on multiple occasions, and was also publicly stated that D'Angelo was also a partner and that they work in teams. I did extensive due diligence on MDA before I utilized its money service business and transferred $2.5

4

> million of my funds. There was nothing, privately or publicly, that was available at the time that indicated that anything was wrong at MDA, or that D'Angelo had withdrawn from the partnership. Had I known the truth, I would not have trusted MDA with my funds.

(Dkt. No. 96-1 ¶¶ 19-21, 24-25; *see also* Dkt. No. 1 ¶¶ 40-89.)  In particular, Plaintiff attests to the accuracy of paragraphs 40-89 of the complaint, which allege "Plaintiff repeatedly requested the transfer of his funds" worth $2.5 million USD so he could purchase a residential property, then Mr. Morris and MDA failed to timely provide the funds.  (Dkt. No. 1 ¶¶ 40-89.)  As Plaintiff summarizes the resulting harm:

> Plaintiff has sustained significant damages as a result of the failures of MDA, […] Morris, D'Angelo, and Geller as set forth herein. Plaintiff has been and continues to be deprived of his original $2.5 million USD. Plaintiff could not close on the property transaction initiated on April 28, 2023, as scheduled. Plaintiff therefore lost a deposit on the property in the amount of $318,750.00 AUD, (approximately $213,148.12 USD as of June 27, 2023). Plaintiff has been penalized and will continue to be penalized as a result of his failure to perform the transaction due to Defendants' actions. Plaintiff also incurred damages related to his purchase of home insurance, a payment to a buyer's agent, and payments to building inspectors, and payments to Goulden Legal (an Australian law firm). Plaintiff is also liable for vendors' fees and expenses associated with the resale of the property and vendors' costs and expenses related to Plaintiff's default. Cumulatively, these ancillary damages are worth approximately $423,384.66 AUD, ($283,189.30 USD as of June 27, 2023). Taken together, Plaintiff has lost approximately $2,996,337.42 USD as a result of Defendants' actions to date, and will continue to incur damages into the future.

(*Id.* ¶ 89.)  On February 26, 2025, the Court entered a stipulated judgment against Defendants Morris, Geller, and Morris + D'Angelo, jointly and severally, for $3.6 million plus interest.  (Dkt. No. 84.)

**DISCUSSION**

Plaintiff's motion for summary judgment "seeks a finding that D'Angelo is liable as a general partner of Defendant Morris + D'Angelo ('MDA') for Plaintiff's claims in this matter, and specifically that D'Angelo is liable for the already entered judgment in this lawsuit against MDA." (Dkt. No. 96 at 2.)  Plaintiff asserts Morris + D'Angelo is a general partnership under Oregon and California law, and Defendant D'Angelo is liable for the judgment entered against MDA under the laws of both states.  Plaintiff proceeds on two theories under California and Oregon law: actual partnership and partnership by estoppel.  First, as a partner of the firm, Mr. D'Angelo is liable

5

1   jointly and severally for obligations of the partnership.  Second, in the alternative, if Mr. D'Angelo

2   is not an actual partner, "D'Angelo and MDA repeatedly held out D'Angelo to be a general

3   partner of MDA to Plaintiff and Plaintiff reasonably relied on those representations in engaging

4   MDA, which ultimately resulted in MDA fraudulently inducing Plaintiff to transmit funds to

5   MDA, and MDA misusing and then failing to return Plaintiff's funds."[2]  (*Id.*)

6        For the reasons set forth below, the Court GRANTS Plaintiff's motion.  The undisputed

7   facts show MDA is a general partnership in California.[3]  Drawing inferences in Defendant's favor,

8   there are also no genuine disputes of fact that Plaintiff entered into a transaction with MDA to his

9   detriment, reasonably relying on Mr. D'Angelo's representations that Mr. D'Angelo was a partner

10  of the firm.[4]  As such, as a matter of law, Mr. D'Angelo is liable for the judgment entered against

11  MDA as if he were a partner of the firm.

12       California Corporations Code Section 16308(a) provides:

13            If a person, by words or conduct, purports to be a partner, or consents

---

[2] Plaintiff uses the phrase "fraudulently inducing Plaintiff to transmit funds," but the California statute that provides for partnership by estoppel does not require a finding of fraud.  *See* Cal. Corp. Code § 16308(a).

[3] The Court will not address Oregon law in light of potential disputes regarding MDA's status as general partnership in Oregon.  The record has some evidence of what work MDA conducted in Oregon, but not enough to conclude as a matter of law MDA was a general partnership in the state. Plaintiff offers evidence the firm submitted three registration filings with the Oregon Secretary of State's Corporation Division.  (Dkt. Nos. 96-4, 96-7, 96-8.)  All three list Mr. D'Angelo as a "registrant/owner" and two describe MDA as a "general partnership."  (Dkt. Nos. 96-4 at 2, 96-7 at 2, 96-8 at 2.)  The most recent filing, however, does not describe MDA as a "general partnership."  (*See id.*)  Mr. D'Angelo also testified at his deposition "[w]e're just a general partnership in California," he was not aware of a general partnership being started in Oregon, he had "never seen" these filings before his deposition, and he "had nothing to do with filling either one of these out. This is all handled by Mr. Morris."  (Dkt. No. 96-3 at 27:16-22, 29:2-4, 83-12:13, 85:1-3.)

[4] The Court will not address Plaintiff's actual partnership theory because, drawing reasonable inferences in Mr. D'Angelo's favor, a reasonable juror could find he was no longer a general partner of MDA after January 5, 2022 because he disassociated from the partnership.  Under California law, "[a] partner is disassociated from a partnership upon the occurrence of … [t]he partnership's having notice of the partner's express will to withdraw as a partner or on a later date specified by the partner." Cal. Corp. Code § 16601(1).  For purposes of this motion, Plaintiff concedes "D'Angelo did in fact sell his entire interest in MDA no later than January 5, 2022, as D'Angelo asserts," (Dkt. No. 96 at 4 n.4.), and "the instant motion is filed on the basis that D'Angelo's *withdrawal* was effective." (Dkt. No. 96-2 ¶ 2) (emphasis added). Mr. D'Angelo also testified he completely sold his interest in the partnership in January 2022 and "stopped being a partner" as part of a years-long transition "plan" with Mr. Morris. (*See* Dkt. No. 96-3 at 17:25-18:1, 38:11-39:4, 40:2-5.)  These facts support an inference Mr. D'Angelo disassociated from the partnership.

6

> to being represented by another as a partner, in a partnership or with one or more persons not partners, the purported partner is liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership. If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner is liable to a person who relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant. If partnership liability results, the purported partner is liable with respect to that liability as if the purported partner were a partner. If no partnership liability results, the purported partner is liable with respect to that liability jointly and severally with any other person consenting to the representation.

Cal. Corp. Code § 16308(a). Stated differently, a purported partner of a partnership "is liable to the person to whom the representation is made if that person, relying on the representation, enters into a transaction with the alleged partnership." *In re Athar*, 2014 WL 806196, *7 (Bankr. C.D. Cal. Feb. 27, 2014). "The representations or acts need not be actuated by the actual intent to deceive; it is sufficient if the course of conduct is such as to induce a reasonable and prudent person to believe that which the conduct would imply." *Armato v. Baden*, 71 Cal. App. 4th 885, 898 (1999).

In California, "[t]he association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a). Here, the undisputed facts show Morris + D'Angelo is a general partnership in California. Mr. Morris and Mr. D'Angelo practiced together as "50/50 partners," and co-owned the firm until at least January 2022, then Mr. Geller and Mr. Morris carried on as co-owners thereafter. (Dkt. No. 96-3 at 17:25-18:1, 38:11-39:4, 40:2-5; Dkt. No. 96-5.) No inferences can be drawn in Mr. D'Angelo's favor that the firm is not a general partnership; Mr. D'Angelo testified, to his knowledge, "the firm [is] still a general partnership in California." (Dkt. No. 96-3 at 28:15-18.)

The undisputed facts also show Mr. D'Angelo repeatedly, "by words or conduct, purport[ed himself] to be a partner" to Plaintiff. Cal. Corp. Code § 16308(a).[5] Plaintiff attests Mr.

---

[5] The Court is not finding liability on the basis that someone other than Mr. D'Angelo represented he was a partner of the firm because such a finding under California law requires Mr. D'Angelo "consent[] to being represented by another as a partner[.]" Cal. Corp. Code § 16308(a). There are potential disputes of fact as to whether Mr. D'Angelo consented to representations made by others

7

1   D'Angelo "introduced himself as a partner of MDA" to Plaintiff in May 2021. (Dkt. No. 96-1 ¶ 3.)
2   Mr. D'Angelo continued to communicate with Plaintiff before and after his withdrawal from the
3   partnership.  (*See generally, e.g.*, Dkt. No. 96-3 at 110-113 (testimony acknowledging email
4   chains from December 2021 through April 2022).)[6] Plaintiff attests "Morris and D'Angelo
5   specifically told me that they were both partners of MDA" in "all of these discussions and the
6   discussions that were to follow." (Dkt. No. 96-1 ¶¶ 3, 8.)  For example, Mr. D'Angelo sent
7   Plaintiff an email on April 12, 2022 with an email signature that said "Managing Partner" above
8   the firm's name.  (Dkt. No. 96-1 ¶ 11; Dkt. No. 96-21 at 2.)  Mr. D'Angelo acknowledged this was
9   "the same email signature that [he] had used in the past," which "says that [he is] the managing
10  partner at the firm." (*See* Dkt. No. 96-3 at 122:2-25.)  Plaintiff attests "[a]t no time did anyone
11  inform us that [Mr. D'Angelo] was no longer a partner at the firm," (Dkt. No. 96-1 ¶ 15), and Mr.
12  D'Angelo has no knowledge of "ever tell[ing Plaintiff] … that [he] w[as] no longer a partner at the
13  firm[.]" (Dkt. No. 96-3 at 123:3-5.)

14  And the undisputed facts show Plaintiff, "relying on the representation, enter[ed] into a

---

after his withdrawal from the partnership.  For instance, some of those representations were made in engagement letters, but Mr. D'Angelo testified he [a]bsolutely did not" prepare or sign an engagement letter from November 2021, despite his electronic signature appearing on the letter, because the firm's office manager "has a stamp of my signature" for "routine stuff like this." (Dkt. No. 96-3 at 103:17-18, 104:24-25.)  Similarly, Plaintiff suggests the firm's website states Mr. D'Angelo is still a partner, but Mr. D'Angelo testified the website was "under [Mr. Morris]'s control and we had no capability to make any changes to the website … so it's not kept current." (*Id.* at 35:6-7.)  In particular, "[w]hen [he] realized that [he] was still showing up as a partner" on the website, Mr. D'Angelo "asked" about the website "and absolutely nothing has been done." (*Id.* at 35:13-19.)  So, drawing inferences in Mr. D'Angelo's favor, he did not consent to others holding him out as a partner after his withdrawal.

[6] At his deposition, Mr. D'Angelo testified he "absolutely" "remember[s] the process of getting to this point [in May 2022] and engaging … [Plaintiff] as a client," (Dkt. No. 96-3 at 131:18-25), but he could not recall specific details about his communications with Plaintiff until prompted by the exhibits containing the communications.  (*See generally, e.g.*, *id.* at 118-129.)  For instance, when Mr. D'Angelo was shown the chain of emails from December 2021 to April 2022, he attempted to ask Plaintiff's counsel questions about the emails, then stated "I'm trying to figure out" the meaning of certain statements.  (*Id.* at 118:9-24.)  Shortly after reading another exhibit, Mr. D'Angelo commented "I don't understand why we're not getting an updated engagement letter.  Honestly, that makes no sense to me. … Hopefully, future exhibits cover that[.]" (*Id.* at 120:6-10.)  Mr. D'Angelo testified there is "not a chance" he remembers what was discussed at a whiteboarding session between him and Plaintiff and had no "specific recollection" of the session, but "it's clear to me that we did have the whiteboarding session." (*Id.* at 124:12-20.)  At no point, however, did Mr. D'Angelo dispute the authenticity or contents of exhibits he was shown.  (*See generally id.* at 118-125.)

8

transaction with the actual or purported partnership." Cal. Corp. Code § 16308.  Plaintiff attests "on July 28, 2022, I transferred stablecoin assets (digital assets where one token is worth one U.S. dollar) in an amount of $2.5 million as instructed by MDA."[7]  (Dkt. No. 96-1 ¶ 20.)  He also attests:

> I never would have transferred these funds had I not been under the impression that they would be held secure by MDA, and that MDA included D'Angelo as a partner. Without D'Angelo being a partner, and one who I communicated with and worked with on many occasions and trusted, I never would have trusted MDA.

(*Id.* ¶ 21.)  Plaintiff also attests MDA "never wired the funds" back to Plaintiff, so "Plaintiff has been and continues to be deprived of his original $2.5 million USD," among other damages.  (*See* Dkt. No. 1 ¶¶ 86, 89; Dkt. No. 96-1 ¶ 24 (attesting to the accuracy of paragraphs 40-89 of the complaint); *see also* Dkt. No. 1 ¶¶ 40-89.)  Mr. D'Angelo's testimony did not dispute this money transfer occurred or MDA's failure to return the money.  (*See generally* Dkt. No. 96-3 at 138-145.)[8]  Rather, he testified he spoke with Mr. Morris about the transfer and "Mr. Morris acknowledge[d] that he did indeed accept funds from [Plaintiff] … and that those funds … were no longer available[.]"  (*Id.* at 141:14-24.)  Mr. D'Angelo also testified "I think [Plaintiff]'s been

---

[7] The record shows Plaintiff sought different services from the firm at various times. The specific transaction upon which the Court finds liability is the unreturned transfer of money "instructed by MDA." (Dkt. No. 96-1 ¶ 20.)  This transfer is the heart of Plaintiff's lawsuit and the judgment entered.  (*See* Dkt. No. 1 ¶¶ 40-88 (describing the transfer and Plaintiff's attempts to get the money back), ¶ 89 ("Taken together, Plaintiff has lost approximately $2,996,337.42 as a result of Defendants' actions to date, and will continue to incur damages into the future."); Dkt. No. 84 (judgment amount totals $3.6 million, plus interest).)

[8] At one point in his deposition, Mr. D'Angelo questioned, based on the exhibits he was being shown, "I'm still wondering if [Plaintiff] accepted the engagement letter. Did they say yes? Did they start paying up? Because I don't see that here." (Dkt. No. 96-3 at 132:23-25.)  After some back-and-forth, Mr. D'Angelo testified "I know [Plaintiff] was working with [Mr. Morris] directly, but I didn't know what it was about. … I had no idea what happened over there. And I'm – I'm gathering here from memory that this did not work out well in terms of this engagement letter and getting the work done." (*Id.* at 133:19-135:18-21.)  Then, Plaintiff's counsel showed Mr. D'Angelo an email in which "the first line of the message says that certain work … is included in the 2022 subscription engagement letter" and asked "Does that help resolve your concern that [Plaintiff] actually engaged the firm to do certain work?" (*Id.* at 137:1-21.) Mr. D'Angelo responded "Yes" and described the email: "so I can see now that other than forming an entity, the basic work that we're going to do for [Plaintiff] is going to happen by [another employee who is] … writing them right now saying, this is what we want to do." (*Id.* at 137:22-138:4.)  This testimony does not create factual disputes as to whether a transaction was entered into because at no point did Mr. D'Angelo dispute Plaintiff's claims about the unreturned transfer. (*See generally id.*)

royally screwed here and I feel terrible about it." (*Id.* at 155:5-6.)  So, there are no inferences to be drawn in Mr. D'Angelo's favor that Plaintiff did not, to his detriment, reasonably rely on representations purporting Mr. D'Angelo to be a partner of the firm.  Therefore, as a matter of law, Mr. D'Angelo is liable to Plaintiff as a purported partner of Morris + D'Angelo.  (Dkt. No. 84); Cal. Corp. Code § 16308(a) ("[T]he purported partner is liable to a person to whom the representation is made[.] … If partnership liability results, the purported partner is liable with respect to that liability as if the purported partner were a partner.").

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's motion for summary judgment and finds, under California Corporations Code Section 16308(a), Defendant D'Angelo is liable for the judgment entered against Defendant Morris + D'Angelo as if he were a partner of the general partnership.  After his purported withdrawal from the general partnership, Defendant D'Angelo represented he was a partner of the firm to Plaintiff, who reasonably relied on those representations to enter a transaction with the partnership to his detriment.  A separate judgment will be entered.

This Order disposes of Docket No. 96.

**IT IS SO ORDERED.**

Dated: December 16, 2025

JACQUELINE SCOTT CORLEY
United States District Judge